## LAFOND MOTOR CO. et al. v. NORTHERN PAC. RY. CO.

District Court, D. Minnesota, Fourth Division. June 24, 1932.

George H. Smith and Victor J. Hermel, both of Minneapolis, Minn., for plaintiff.

D. F. Lyons, M. L. Countryman, Jr., and Conrad Olson, all of St. Paul, Minn., for defendant.

MOLYNEAUX, District Judge.

This action was brought to recover damages on the failure of the defendant to comply with the award of the Interstate Commerce Commission, declaring reparation for alleged freight overcharges, made by defendant on shipments of automobiles over its line of railway between November 28, 1925, and April 7, 1927.

The pertinent facts are as follows:

The defendant operates two lines of railroad between Minneapolis and Coon Creek, on the one hand, and Duluth and Carlton, on the other. The shorter, direct line passes through White Bear, Wyoming, and Rush City; the longer, circuitous route passes through St. Cloud, Little Falls, and Brainerd. The distance from Minneapolis to Carlton, over the direct route, is 136.4 miles, while the distance via the circuitous route, through St. Cloud, Little Falls, and Brainerd, is 218.3 miles. The shipments were from North Flint, Mich., and consisted of automobiles.

They moved over certain connecting carriers to Minneapolis, thence over the Northern Pacific through Coon Creek, some to St. Cloud, Minn., and some to Little Falls, Minn. Charges on shipments were made on the basis of a combination rate composed of $1.57 to Coon Creek; and the appropriate factor beyond to the point of destination. A rate of $1.57 applied to Duluth and Carlton, and plaintiff contends that the same rate applied to the destinations named, St. Cloud and Little Falls, upon the theory that such named points are situated on defendant's line directly between Coon Creek and Duluth, within the meaning of the following tariff provision: "To an intermediate point of destination which is not named herein, but which is situated directly between two points on the same railroad to which rates are published herein, the rate will be the same as the rate named in this tariff, or as supplemented, to such two points unless the rate to such two points is not the same, in which case the rate to the intermediate point will be that applicable to that one of such two points to which the higher rate is published herein."

Neither of the destinations, St. Cloud or Little Falls, are embraced in the tariff. The $1.57 rate applied to Duluth and also to Carlton, over several different routes, including the one over which the shipments were moved, but prior to March 22, 1927, it was unrestricted as to its application over the lines of the Northern Pacific. Effective on March 22, 1927, it was restricted so as not to apply via Little Falls and Brainerd. There is no question but that the shipments moved as far as Minneapolis over a route specifically defined by the tariff. The distance from Minneapolis to Duluth via St. Cloud, Little Falls, and Brainerd is 239 miles, or 82 miles

longer than the direct route from Minneapolis, north, through White Bear and Rush City.

The route via St. Cloud and Little Falls was not the usual and customary route. It is physically possible to run cars from St. Paul, Minneapolis, and Coon Creek to Duluth and the head of the lakes through St. Cloud, Little Falls, and Brainerd, but there is no direct service that way, and it would cause a twenty-four hour later delivery than by the short line.

In the event that shipments were tendered to the Northern Pacific at Coon Creek, they would be handled by taking them back through Minneapolis, to Duluth, over the short line. There is no through service for either freight or passengers from St. Paul, Minneapolis, and Coon Creek to the head of the lakes, via the circuitous route through St. Cloud and Little Falls, and there never has been any such service since the short line, running through White Bear and Wyoming, was acquired by the Northern Pacific. There is both direct passenger service and freight service over the short line, and all of the business is handled that way. It is necessary to handle both freight and passengers over the short line, for the reason that it would be uneconomical and wasteful to handle it via the circuitous route, and for the further reason that it is necessary to handle it that way to meet the keen competition of other roads who have short lines between Minneapolis and Duluth, and it is necessary to expedite the service between the Twin Cities and the head of the lakes to meet the highly competitive competition. It would be disastrous to the business of the Northern Pacific to handle the business over the circuitous route, and any one in his right mind would not, under the circumstances, think of so doing. There has been no instance when the road has handled business between the Twin Cities or Coon Creek and the head of the lakes through St. Cloud, Little Falls, and Brainerd, since the time the Northern Pacific acquired the short line. The only circumstances under which the business would be so handled would be in the event of an interruption of the service over the short line by some accident or otherwise.

Defendant contends that the points, St. Cloud and Little Falls, are not directly between Coon Creek and Duluth, within the meaning of the tariff. It argues that, while rates unrestricted as to routes are properly applicable over all workable junction points of such carriers, the rates are limited in their application over the lines of the individual carriers to those routes which the carrier customarily uses in transporting its traffic.

Division 5 of the Interstate Commerce Commission found that the route via St. Cloud, Little Falls, and Brainerd was an open route, and that the $1.57 rate was applicable; Farrell, Commissioner, dissenting.

As sustaining its holding, the Commission cited Delmar Co. v. Great Northern Ry. Co., 34 F.(2d) 221 (District Court), and Great Northern Railway Company v. Delmar Co., 43 F.(2d) 780 (same case in Circuit Court of Appeals). Since the award of the Commission in the present case, the Delmar Case was reversed by the Supreme Court (Great Northern Railway Company v. Delmar Co., 283 U. S. 686, 51 S. Ct. 579, 581, 75 L. Ed. 1349) on the ground that the holding of the Commission and the two lower courts, that the route was an open one to the shipper, and that the through rate was applicable, was erroneous, as a matter of law, because, for the reasons stated in the decision, shipment over the longer route, under the circumstances shown in the case, was in violation of section 4 of the Interstate Commerce Act (49 USCA § 4). The court said: "This conclusion is in accord with the principle that, where two constructions of a written contract are possible, preference will be given to that which does not result in violation of law."

It will be noted that the Supreme Court held that the Commission and the two lower courts came to the wrong conclusion because of an improper construction of the tariff provision.

The Commission has consistently held, as a matter of law, that, when two or more routes are open, the shipper has the option of routing, in the absence of a contrary statement in the tariff, but it is contended by the defendant that as a matter of law the tariff provision must be construed to mean that the shipper in such case must be confined to the route or routes usually and customarily used, and in its more recent decisions the Commission seems to have adopted this latter view.

In the case of Miner Lumber Co. v. Penn. R. R. Co. et al., 161 I. C. C. 801, decided March 11, 1930, by the entire Commission, it was stated as follows: "In no case where the application of rule 77 has been considered have we established any definitely settled rule of what is or is not a reasonable or natural route. Every case has been decided on its own merits. While the circuitous routes shown from Cincinnati to Medina are not specifically prohibited they are such as would

never be used in the forwarding of traffic and to recognize such grossly unnatural and circuitous routes for the purpose of applying rule 77 is to distort the concept of the rule itself."

In the same decision Commissioner Eastman, in a concurring opinion, made the following observations:

"But we have of late had a flood of cases like the instant case which have made it necessary to consider so-called 'open route' tariffs from an angle which has not been so clearly presented in the past. This development is, I think, the result of the more extensive use by shippers of tariff experts and the discovery by the latter of certain possibilities in the 'Rule 77' and 'intermediate point' provisions which had not theretofore been fully appreciated. * * *

"Upon consideration it seems to me that a combination of lines over which no shipper in his right mind would ever think of moving freight between two given points can not rightly be regarded as a route. * * * It must be borne in mind that in this class of cases the complainant has not used and does not wish to use the route upon which he relies; he merely wishes to have his shipping point regarded as an intermediate point upon that theoretical route. * * *

"I see no reason to believe that a shipper would find it desirable to move freight over the very roundabout and time-wasting combinations of lines which are relied upon. * * * "

Commissioner Woodlock, also concurring, stated as follows: "I may further point out that the principal 'uncertainty' under which shippers have rested in the past with respect to these rules and their application is the extent to which this commission would permit a retroactive use thereof for the purpose of awarding 'reparation' or refund of alleged 'overcharges' on the theory that any point was 'intermediate' or 'directly intermediate' to any other point over any 'route' which was not specifically closed by tariff provisions, regardless of the circuity of movement thereby required. It seems to me eminently proper that common sense should rule in the elimination of that 'uncertainty' so far as the past is concerned, seeing that it has effected its elimination for the future."

Subsequent to the foregoing decision the Commission on October 31, 1931, in the case of Capital Iron Works Co. et al. v. Atchison, Topeka & Santa Fé Railway Company et al., 179 I. C. C. 10, said, in considering the identical question, as follows:

"Much of the controversy in this case centers about the words 'directly intermediate' in the foregoing provision. The parties agree that to be directly intermediate the points should be intermediate on reasonably direct routes. Defendants contend further that they must also be intermediate on routes over which the traffic generally moves. * * *

"Defendants urge that routes in connection with these lines of the Santa Fé and the M-K-T. are the direct and usual routes from the points of origin considered to Humboldt and Chanute, and that as the destinations to which complainant's shipments were made are not on these routes they can not be regarded as 'directly intermediate' within the meaning of the provision above quoted. * * *

"Under all the facts and circumstances here shown we are of the opinion that the commodity rates in effect prior to July 14, 1928, from the origins concerned to Humboldt and Chanute were not applicable on the shipments considered over routes via Junction City and other interior Kansas junction points, for the reason that such routes are irregular and indirect and are not such as the carriers are, by law, required to establish and operate. We find that the rates assailed were applicable. The complaint will be dismissed."

In the recent case of Harmon C. Smith v. Chicago & North Western Railway Company et al., 178 I. C. C. 714, complainant contended that St. Cloud and Willmar are directly intermediate between Minnesota Transfer and Brook Park, under an intermediate tariff provision, which is word for word like the one involved in this proceeding. The tariff provided a joint rate of $1.65 to Minnesota Transfer, Minneapolis, Brook Park, and Duluth, over several defined routes; the routing was unrestricted as to its application over the Great Northern. The routing over the Great Northern being unrestricted, the complainant contended that the $1.65 rate applied to St. Cloud and Willmar, based upon the theory that these points are situated directly between Minnesota Transfer and Brook Park, two points on the same railroad to which the $1.65 rate was published, and therefore subject to that rate under the intermediate provision. The Commission said on page 716 of 178 I. C. C., as follows:

"Defendants explain that the direct and customary route to Brook Park is via Cambridge and that traffic seldom, if ever, moves

from Minnesota Transfer to Brook Park via St. Cloud or Willmar. * * *

"The distance from Minnesota Transfer to Brook Park via St. Cloud is 128 miles or 54 miles longer than the direct route and via Willmar it is 212 miles, or 138 miles longer than the direct route. These routes are circuitous and unnatural and consequently St. Cloud and Willmar can not be considered 'directly between' Minnesota Transfer and Brook Park within the meaning of the intermediate rule."

The following cases in the federal courts are to the same effect as these recent decisions of the Interstate Commerce Commission: Standard Oil Co. v. Penn. R. R. Co. (C. C. A.) 40 F.(2d) 52; Updike Grain Corp. v. St. Louis & S. F. Ry. Co. (C. C. A.) 52 F.(2d) 94, 95.

In Standard Oil Co. v. Penn. R. R. Co., supra, on pages 53 to 56 of 40 F.(2d), the court said:

"This tariff specifies rates to named railroad points to the number of over 1,600. Item 20 of the tariff prescribes the 'intermediate rule' as follows: 'Application at Intermediate Points. To or from points where rates are not specifically named in this tariff, but which are directly intermediate to or from points having specific rates, the rate to apply will be the rate as named to or from the first specified point beyond the point not having a specific rate.'

"All the shipments here in question, about 60 cars. originated at Wood River, and were routed via Formosa over the P. R. R. to about 30 different Indiana points on the P. R. R. which were not specifically named in this tariff, but which points appellant contends were directly intermediate to either Bernice, Ill., Effner, Ind., or Gary, Ind., each of which three points is specifically named in this tariff, with a rate of 17.5 cents, and each being the first point on the P. R. R. lines beyond the destination points in question, which are specifically named in the tariff, the tariff naming no other intervening points on P. R. R. lines after crossing the Indiana west boundary.

"Appellant contends that all the destination points in question are directly intermediate to Bernice, Effner, or Gary, and therefore took the I. T. R. tariff rate fixed for these three points. * * *

"The I. T. R. tariff fixed rates from these points of origin to something over 1,600 named points. Of these over 1,400 are in Illinois, being nearly half of the total number

of railroad stations in the state. Practically every station on the P. R. R. line from Formosa, which is near East St. Louis, east to the Indiana boundary, is named; and so with all the railroads which joined in this tariff. In all of Indiana but 19 points are named, of which 17 are in Lake county, the northwest county of the state, and two in the county next south. All the 19, and Bernice, Ill., are what are commonly known as Chicago rate points. The last rate point in Illinois on this P. R. R. line is Farrington, close to the Indiana border, and from this point to Bernice, Effner, and Gary no points or rates are named. There are other railroads running almost directly from the tariff points of origin to Bernice, Effner, and Gary, which are nearer by many miles than the route over the P. R. R. If the shipper may choose a circuitous rather than a direct route for reaching these rate points, and have for them the benefit of the Chicago rate, is he privileged also to choose this route for all the intermediate points and have the rate of the intermediate rule? If so, the possible effect would seem startling, at least to non-experts in tariff making and interpretation.

"All of the various participating carriers which cross this state line have Illinois rate points close to the line, but none in Indiana, except that a few of them touch one or more of the 19 points about the northwest corner of the state. But by routes more or less circuitous most of them could participate in the movement of petroleum from the initial points of the I. T. R. tariff, ultimately reaching one of the Indiana named points, either over their own routes, or over the routes of others of the participating carriers; and shippers to points along the line between the last Illinois rate point and those. in northwestern Indiana might be entitled to the same rate as these northern Indiana points. For example: This P. R. R. line divides at Terre Haute, that over which the shipments here in question passed extending northeasterly to Logansport, and thence northwesterly to the rate points. Another of its lines runs mainly east, through Indianapolis to Richmond, Ind., near the Ohio line; thence north through Ft. Wayne, and northwesterly to one or more of the Indiana rate points. Does this give the 17.5 cent rate to all the points along this line because of the fact that Indiana rate points may so be reached? By combination of routes over lines participating in this tariff it is safe to say that such routes would pass a large majority of the railroad stations of Indiana, which being thus in the line of travel would, by application of the

intermediate rule, be entitled to the same rate. It is difficult, if not impossible, to conclude that thus by the application of the intermediate rule the Chicago rate was extended to the majority of Indiana points. * * *

"But it is insisted for appellant that P. R. R., by consenting to a rate from Wood River to Gary, and to the intermediate rule of the I. T. R. tariff, must carry at that rate to Gary and points intermediate. But each of the other thirty-six concurring lines published the same rate to Gary, and to the 1,600 other named points. This does not mean that each of them undertook to carry freight to each of those points. Comparatively few of them touch any of these points or even the points of origin; but the rates were binding upon them to the extent that they might participate in the normal movement of the freight from origin to destination.

"To illustrate again: If the Baltimore & Ohio, one of the lines which likewise participated in the I. T. R. tariff, undertook to carry carload petroleum from these points of origin to Gary over its own lines, it might do so over its line from East St. Louis across Illinois and Indiana to Cincinnati, Ohio, thence northeasterly to Deshler, Ohio, and northwesterly across Indiana to Gary. Indeed, this would be its shortest route. The last Illinois rate point along this route is Bridgeport, near the Indiana state line, and there is no other rate point until Gary is reached. Can it be said that because B. & O. concurred in the I. T. R. tariff it undertook by the I. T. R. intermediate rule to carry freight at the Gary rate from the points of origin to any point on its lines, first across southern, and then across northern Indiana?

"We can only say we cannot believe that participation in this tariff would, through the operation of the intermediate rule, confer the Chicago rate upon all or any Indiana stations of these carriers over any line or lines of the participants whereby Gary or the other Indiana rate points may be reached. * * *

"Speaking generally of the points there in issue, Division 1 referred to them as being 'on circuitous routes'; and in the opinion of the Commission it was said, 'all the destinations being intermediate to Chicago or Chicago rate points on routes which would be circuitous to the latter point.' We so regard as circuitous the Indiana rate points here in question, over the P. R. R. route which passes the destination points here in issue, in that the Indiana rate points (also Bernice, Ill.) may be reached by routes far more direct, and involving much less mileage, than the route passing the destination points in issue.

"We are further satisfied that the I. T. R. tariff did not, through its 'intermediate rule,' fix rates to Indiana points; and that, in any event, the destination points here in issue are not 'directly intermediate' within the purview of the intermediate rule."

In Updike Grain Corporation v. St. Louis & S. F. Ry. Co., supra, the court said:

"If this circuitous route to Vicksburg is authorized by tariff 1218–K, then undoubtedly Birmingham is an 'intermediate' point on that route. If it is also 'directly intermediate,' a shipment such as that here is entitled, as appellant urges, to the Vicksburg rate fixed in the tariff. * * *

"But if it be conceded that * * * the lines of the Alabama and Vicksburg (from Meridian to Vicksburg), is an available route to Vicksburg, although obviously circuitous, there is still the question whether Birmingham is a 'directly intermediate' point and as such entitled to the Vicksburg rate.

"Birmingham is indeed on any such route as that constructed by the shipper an 'intermediate' point, as are scores of other towns and cities located in Alabama, but in any common-sense view of the situation it seems absurd to say that Birmingham is 'directly intermediate' between a shipping point in Nebraska and Vicksburg, Miss. If the word 'directly' in the phrase 'directly intermediate' means anything (and in the construction of a tariff effect should be given to every word, clause, and sentence, Pillsbury Flour Mills Co. v. Great Northern Ry. Co. (8 C. C. A.) 25 F.(2d) 66, 69), it would seem at least to suggest a point on a route reasonably direct from the point of origin to the specified destination. Such is the more plausible construction of the phrase 'directly intermediate.' Such was the construction given it by the Circuit Court of Appeals for the Seventh Circuit in Standard Oil Co. v. Pennsylvania R. Co., 40 F.(2d) 52. Birmingham is, not only not on any direct route from points in Nebraska to Vicksburg, but it is wholly outside and remote from the trade territory embraced in tariff 1218–K. * * *

"Our conclusion is that route 116 as completed by the shipper was not an available route under tariff 1218–K, and that in any event Birmingham was not a 'directly intermediate' point on that route."

The proper construction of a tariff is a question of law, and it will be noted that in all of these cases cited the cases turn upon

the proper construction to be given to the tariff.

While the decisions of the Interstate Commerce Commission are prima facie evidence of the facts found by the Commission, the holdings of the Commission, as to the proper construction of a tariff being a question of law, is not binding upon this court, both the Commission and the court are required to follow the law.

It is my opinion that the decision of the Interstate Commerce Commission, out of which this proceeding arises, is unsupported by the evidence and is based upon an erroneous conclusion of law; that the facts clearly show that the usual and customary route of the movement between Minneapolis, on the one hand, and Duluth and Carlton, on the other, is over the direct line passing through Rush City, and that the indirect or circuitous route passing through St. Cloud and Brainerd is unreasonable, unnatural, abnormal, and one over which no shipper would desire to have his freight handled; that the defendant, by becoming a party to the tariff in question, did not thereby hold itself out or engage to handle any shipments over that route, but merely agreed to handle shipments over its usual and customary route, and that St. Cloud and Little Falls are not points directly intermediate between Minneapolis and Duluth, within the meaning of the intermediate clause, and that plaintiffs are not entitled to have applied to those points the Duluth and Carlton rates. The plaintiffs have not and could not have been misled. They have suffered no damages, and are not entitled to recover.