**A. E. WEST PETROLEUM CO.**

v.

**ATCHISON, T. & S. F. RY. CO. et al.**

No. 14746.

United States Court of Appeals,
Eighth Circuit.

May 4, 1954.

Rehearing Denied June 15, 1954.

Action to recover the amount of a reparation award entered by the Interstate Commerce Commission in favor of the plaintiff. The United States District Court, for the Western District of Missouri, Albert A. Ridge, J., 108 F.Supp. 644, dismissed the complaint and plaintiff appealed. The Court of Appeals, Stone, Circuit Judge, held that construction of tariff routing instructions by applying intermediate destination rule so as to make Kansas City, Missouri, an intermediate point between gateway in Chicago, Illinois and a destination point in Iowa was unreasonable, and plaintiff was not entitled to rate based on such construction, even though Kansas City would be an intermediate point in a possible route over lines of participating carriers.

George L. Gisler, Kansas City, Mo. (Lee Reeder, Lewis A. Dysart and Reeder, Gisler & Griffin, Kansas City, Mo., on the brief), for appellant.

S. R. Brittingham, Jr., Chicago, Ill. (Robert L. Hecker and Henry W. Fox, Kansas City, Mo., on the brief), for appellees.

Before GARDNER, Chief Judge, and STONE and THOMAS, Circuit Judges.

STONE, Circuit Judge.

This is an appeal by the A. E. West Petroleum Company (a corporation) from a judgment dismissing its action against the several appellee railroads to recover the amounts of freight overcharge reparation payments ordered by the Interstate Commerce Commission, Federal transportation taxes paid by appellant upon the overcharges, and attorney fees. The broad issue is the applicability of an intermediate-point rate, as construed by the Commission, on shipments of petroleum products from Bradford, Pennsylvania to Kansas City, Missouri.[1]

### Jurisdiction

Before reaching the merits of this controversy, a matter of jurisdiction urged by plaintiff (appellant) must be resolved. Plaintiff contends that the construction of the meaning of a rate regulation of the Commission made by the Commission is "not subject to judicial review unless arbitrary or in excess of the powers conferred" upon it. To this contention, defendants urge two answers: (1) that the District Court de-

---

1. The Commission Report and Order are in 276 I.C.C. 429 and the District Court opinion in 108 F.Supp. 644, 650.

termined that the construction by the Commission was arbitrary; and (2) that the construction of the meaning of a tariff, where no factual issue is present and the words therein are used in their ordinary meaning, presents an issue of law which the Court may determine. Each of these answers is sound, insofar as jurisdiction of the District Court is involved.[2]

■ Bearing on the first answer, the District Court states: the construction by the Commission "brings about absurd consequences and one which we do not believe can be sustained by reasonable construction, or is contemplated by the I.C.C. Act * * *". And again, the Court refers to certain other decisions of the Commission "for the purpose of better pointing up the arbitrary, ultimate absurdity and unreasonableness of the rule attempted to be enforced by the I.C.C. in the instant award."

■ As to the second answer, there is here no issue of fact and the words of the tariffs are used in their ordinary significance. In such situation, the construction of the tariffs presents a purely law issue which Courts made decide.[3] Nor is such decision prevented because it may involve construction of a Rule of the Commission which is made part of the tariff.[4]

## Merits

The shipments involved here were carlots of lubricating oil shipped from Bradford, Pennsylvania, which were consigned to plaintiff's assignor at Kansas City, Missouri. Plaintiff and its as-signor were distributors of such products at Kansas City. The carriers and routes from Bradford to "gateways" of the Central Freight Association territory are not involved here. The dispute has to do with the transportation of these articles beyond one of these "gateways"—here Chicago.

Agent Kipp and Agent Jones were two separately authorized agents of defendants and other carriers for the purpose of publishing tariffs governing carriage over participating carriers lines. The Kipp Tariff named a specific rate of 67 cents per hundred pounds for such petroleum products from Bradford to Kansas City. The Jones Tariff contained no named rate from Bradford to Kansas City but it did name a rate of 53 cents from Bradford to a group of stations in central and eastern Iowa—Moravia and Cedar Rapids being representative. Defendants collected the 67 cent rate. Plaintiff's contention that the 53 cent rate was applicable was upheld by the Commission in a reparation proceeding. Defendants refused payment and this suit resulted.

The crucial dispute is whether Kansas City is, for freight rate purposes, an "intermediate-point" between Bradford and the Iowa stations within the meaning of certain general provisions of the Jones Tariff. These provisions concern intermediate-point rates and routing instructions. These provisions were identical with certain general Rules of the Commission. The here pertinent parts of such Rules are set forth in the footnote.[5]

2. Whether the ultimate conclusion reached by the District Court is right is, of course, rather a matter of merits than jurisdiction.

3. W. P. Brown & Sons Lumber Co. v. Louisville & Nashville R. R. Co., 299 U. S. 393, 397, 57 S.Ct. 265, 81 L.Ed. 301; Great Northern Ry. Co. v. Merchants Elevator Co., 259 U.S. 285, 291, 42 S.Ct. 477, 66 L.Ed. 943; Western Oil & Fuel Co. v. Great Lakes Pipe Line Co., 8 Cir., 210 F.2d 490; Updike Grain Co. v. Chicago & N. W. Ry. Co., 8 Cir., 35 F.2d 486, 487; Pillsbury Flour Mills Co.

v. Great Northern Ry. Co., 8 Cir., 25 F. 2d 66, 68.

4. W. P. Brown & Sons Lumber Co. v. Louisville & Nashville R. R. Co., 299 U.S. 393, 395–396, 57 S.Ct. 265.

5. The intermediate-point rate Rule (Rule 27 of Supp. 5 to I.C.C. Tariff Circular No. 20) is as follows:

"*Commodity rates applicable to intermediate points.*—Subject to the provisions of notes 1, 2, 3 and 4 below, to any point of destination to which a commodity rate on a given article from a given point of origin via a given route is not named;

The essence of the intermediate-point Rule is that where a rate is not named in the tariff for the destination station and where that station is "intermediate to a point to which a commodity rate on said article is published in this tariff via a route through the intermediate point over which such commodity rate applies from the same point of origin" the applicable rate is that published "to the next point beyond to which a commodity rate is published herein * * * via the same route."

The essence of the routing Rule is that where the tariff is not restricted to specifically named routes, the rates apply "via all routes made by use of the lines of carriers parties to the tariff except as otherwise specifically provided in the tariff." Since the Jones Tariff did not provide complete routing for such shipments from the Central Freight Association gateways to destination points beyond and since Kansas City was not "specifically" excepted in that Tariff, the routing provision that the rates apply "via all routes made by use of the lines of the carriers parties to the tariff" becomes activated.

Concisely stated, the opposed results of the Commission and of the District Court are based upon the following differences of construction of the Jones Tariff. The Commission gave literal final force to the routing provision that the tariff applied "via *all* routes made by use of the lines" of parties to the tariff (emphasis supplied); and, since a physically continuous route was possible from Chicago through Kansas City to the Iowa points, Kansas City was deemed an intermediate-point within that tariff and, therefore, entitled to the Iowa rate. The Commission thought it immaterial that this routing required appreciable back direction and longer circuitous haul; and that no actual shipments had ever used such route.

The Court thought the view of the Commission was too narrow in that it denied all effect to the unnatural factual situation; and gave no consideration to broad purposes of the Interstate Commerce Act, to the purposes of the intermediate-point provision of the Tariff, or to the absurd results of regarding Kansas City as an intermediate point on the Iowa stations route.

Since a *physical* connection of participating carriers exists from Chicago through Kansas City to the Iowa points, the ultimate test here is whether the matters which influenced the Court are sufficient to overcome the literal construction given to the Tariff by the Commission. In examining this matter, consideration must be given (1) to the factual situation, (2) to applicable doctrines of construction, (3) to the effect of the Act, and (4) to all pertinent provisions of this Tariff.

(1). *The Facts.* To the gateways (here Chicago), these shipments were subject to specific routings which are not in question. Our concern is with the routing beyond Chicago. Kansas City is southwesterly from Chicago. Cedar Rapids is west of Chicago and north-

in this tariff, which point is intermediate to a point to which a commodity rate on said article is published in this tariff via a route through the intermediate point over which such commodity rate applies from the same point of origin, apply to such intermediate point from such point of origin and via such route the commodity rate in this tariff on said article to the next point beyond to which a commodity rate is published herein on that article from the same point of origin via the same route."

The routing Rule (Rule 4(k) of Circular No. 20) was as follows:

"Routing over which the rates apply (must be) stated in such manner that such routes may be definitely ascertained. (Par. added.)

"This must be accomplished by one of the following plans: (1) By providing that the rates in the tariff apply only via the routes specifically shown therein, or (2) by providing that the rates apply via all routes made by use of the lines of the carriers parties to the tariff except as otherwise specifically provided in the tariff."

easterly from Kansas City. Moravia is southwesterly from Chicago and northeasterly from Kansas City. At all times, there were direct rail routes from Bradford (through Chicago) to the Iowa points, which were not via Kansas City. Representative rail distances are as follows:

| | | |
|---|---:|---|
| Bradford to Chicago | 591 | miles |
| Chicago to Cedar Rapids | 219 | miles |
| Total | 810 | miles |

| | | |
|---|---:|---|
| Bradford to Chicago | 591 | miles |
| Chicago to Kansas City | 452 | miles |
| Total to Kansas City | 1,043 | miles |
| Kansas City to Cedar Rapids | 295 | miles |
| Total | 1,338 | miles |

| | | |
|---|---:|---|
| Bradford to Chicago | 591 | miles |
| Chicago to Moravia | 316 | miles |
| Total | 907 | miles |

| | | |
|---|---:|---|
| Bradford to Chicago | 591 | miles |
| Chicago to Kansas City | 452 | miles |
| Total to Kansas City | 1,043 | miles |
| Kansas City to Moravia | 181 | miles |
| Total | 1,224 | miles |

The pertinent net results of the foregoing facts are that the "route" applied by the Commission required a directional back haul from Kansas City toward Chicago, in excess of the direct route from Chicago, of 528 miles for Cedar Rapids and of 317 miles for Moravia—this excess mileage (from origin to the Iowa point) being, percentagewise, almost 62% as to Cedar Rapids and almost 35% as to Moravia.

An additional weighty fact is that "the records of defendants disclose no normal, customary, cognizable volume of shipments ever moved from Bradford to those destinations via Kansas City."

(2) *Applicable Rules of Construction.* A published carrier rate is in the nature of an offer by the carrier to shippers of a contract for carriage under the terms and conditions contained in the tariff. Therefore, a tariff is to be construed as having the meaning which it would reasonably have to such shippers.[6] Where words in a contract, if construed literally, would produce an unfair, unusual or improbable result, such construction is to be avoided if possible.[7] All pertinent parts of a contract are to be construed together so as to give effect to them.[8]

(3). *Effect of the Act.* The issues here involved have to do with actions of the Commission within the powers granted it under the Interstate Commerce Act. Therefore, the broad purposes of that Act, as affecting railroads, are pertinent subjects of inquiry. The broad purposes of the Act are to furnish railroad transportation to the public at reasonable non-discriminatory charges therefor. While every provision of the Act concerning railroads is intended to fluctuate some phase of these general purposes, there are several which bear more particularly upon the issues here. Two of these are Sections 1 and 4, 49 U.S.C.A. §§ 1 and 4.

These two sections bear upon our problem of construction for two reasons. Section 1 requires establishment of through routing at reasonable rates and Thompson v. United States, 343 U.S. 549, 557, 72 S.Ct. 978, 983, 96 L.Ed. 1134, determines that the Commission has no power, under the Act, to declare a "through route" exists where the evidence of the "carriers' course of business negatives the existence of any such through route" since they never held themselves out as offering such through

---

**6.** Union Wire Rope Corp. v. Atchison, T. & S. F. Ry. Co., 8 Cir., 66 F.2d 965, 966–967, certiorari denied 290 U.S. 686, 54 S.Ct. 122, 78 L.Ed. 591; United States v. I. C. C., 91 U.S.App.D.C. 178, 198 F. 2d 958, 966, certiorari denied 344 U.S. 893, 73 S.Ct. 212, 97 L.Ed. 691.

**7.** W. J. Foye Lumber Co. v. Pennsylvania R. Co., 8 Cir., 10 F.2d 437, 439, certiorari denied 271 U.S. 681, 46 S.Ct. 632, 70 L. Ed. 1149; Pressed Steel Car Co. v. Eastern Ry. Co. of Minn., 8 Cir., 121 F. 609, 611; Champlin v. Commissioner, 10 Cir., 71 F.2d 23, 28.

**8.** Christensen v. Northern P. Ry. Co., 8 Cir., 184 F.2d 534, 536.

service—*the mere circumstance of physical connection is not enough.*

Section 4 is the "Long and short haul charges" requirement which contains the provision that upon application to the Commission and "after investigation" the Commission may "in special cases" authorize a less charge for a longer haul; "and if a circuitous rail line or route is, because of such circuity, granted authority to meet the charges of a more direct line or route to or from competitive points and to maintain higher charges to or from intermediate points on its line, the authority shall not include intermediate points as to which the haul of the petitioning line or route is not longer than that of the direct line or route between the competitive points * * *." This section controls situations of lower rates for circuitous hauls and expressly specifies the cardinal factor of competition.[9] It would be strange if the Commission could accomplish the same results as Section 4 without following the procedure of that section; and do so, in a left-handed manner, through construction of a published tariff rule or provision.

▆▆▆ (4). *Pertinent Provisions of the Jones Tariff.* The immediately pertinent provisions of this Tariff are those regarding intermediate-point rates and routing directions—both hereinbefore quoted. Having in mind the various considerations bearing upon construction, we apply them to the problem of the construction of these Tariff provisions. Neither the intermediate-point provision nor the routing provision can stand alone and govern. They must be construed as pertinent parts of the same tariff. Also, they must be construed so as to carry out the intentions of the parties—resolving any doubts, as to meaning, in favor of the shipper. And again,

any construction must be fitted to and controlled by the fact situation here.

We start with the proposition that the routing provision, standing alone and construed strictly literally, might conceivably cover all physical connections of lines parties to the Tariff.[10] What then is the result when this provision is construed along with the intermediate-point provision, as parts of the same Tariff? This brings us to consideration of the latter provision and that suggests examination of the purpose and function thereof.

▆▆▆ Since carriers are required to publish rates for all places served by them and since our railways form a vast connecting network covering the country, it would be an enormous task to name separately and specifically the rates applicable to and from every station to every other station of all the systems. The purpose and function of intermediate-point tariff provisions are materially to reduce the volume of the published tariffs while preserving the requirement of publication of all rates. This desirable result is brought about through the device of the intermediate-point rate provision that, where a tariff does not name a commodity rate from origin point over a given route to destination, the commodity rate is that published "to the next point beyond * * * via the same route."

Having in mind this reason for and the purpose of the "intermediate-point" provisions in a tariff, the words "next point *beyond*" (italics added) jut forward with important connotations—both directional and commercially practical. *Directionally*, there is the implication of further geographical removal of the commodity rate point from the origin point than is the intermediate point destination.

---

9. Shading into our problem is the general proposition that the overall rate structure must provide net operating revenue to enable a railroad to serve the public adequately. See U. S. v. Great N. Ry. Co., 343 U.S. 562, 72 S.Ct. 985, 96 L.Ed. 1142.

10. Throughout the Act, the distinction is clearly made between "line" and "route". "Line" means the trackage controlled in whole or part by a railroad. "Route" means all connecting trackage of various railroads over which a shipment might continuously travel.

818

Commercial practicality is necessarily implied by the very situation that rates are intensely practical matters dealing with actual transactions and a named commodity rate is used solely as a convenient form of expressing the intermediate-point rate. If the shipment had passed through the intermediate-point to the commodity rate point "next beyond", it would have carried the same rate—a clear implication that such theoretical situation was definitely in mind in formation of the intermediate-point applicable rate.

Unquestionably, the generality of the routing provision and the right of a shipper to the lower rate where two applicable rates exist gives him a generous choice of routes in order to secure the benefit of a lower applicable rate route. However, this selection is not unlimited. This Court recognized that there were limitations when we stated:

"It is notorious that the rates from the Pacific Coast to Chicago are many of them much lower than the rates over the same road from the intermountain country to Chicago. If we assume a similar note here added to the tariff from the Pacific Coast and intermountain points to Chicago under this clause, would every point where the rates are higher than they are from the

Pacific Coast to Chicago be entitled to claim the Pacific Coast rates?" [11]

Thus, the determinative issue is here posed of whether such limits of choice to the shipper in choosing the Iowa point rates have been exceeded under the facts of this case. We agree with the District Court that they have. The reasons for our view are that treating Kansas City as an intermediate-point to these Iowa Points is contrary to both the geographical and the commercially practical purposes of the intermediate-point rate provision of the Jones Tariff; supposes a construction of that provision which cannot, by shippers, be reasonably thought to be its meaning; and which leads to absurd results not within the reasonable understanding of the shipper nor the intent of the carrier. The extent of this back direction haul, the existence of direct routes from Chicago gateway to these Iowa points, and the absence of commercial usage of any route from Chicago via Kansas City to these Iowa points, are considerations combining to convince that Kansas City cannot be an intermediate-point for rating between Chicago and the Iowa points.

That the logical application of the Commission's view leads to improper results is illustrated by two of its later Reports,[12] in February, 1952 and June,

11. National Elevator Co. v. Chicago, M. & St. P. Ry. Co., 8 Cir., 246 F. 588, 592.

12. Pure Oil Co. v. Alton & S. R. R. et al., 284 I.C.C. 461 and Hermann-Brownlow Co. v. Mo. Pac. R. R. Co. (Guy A. Thompson, Trustee), et al., 278 I.C.C. 171. In the Pure Oil Company case, the various shipments of lubricating oil moved over three routes for distances of 986.8, 1085.6 and 1246 miles from Cabin Creek Junction, W.Va., to Tulsa, Okla. The shipper claimed reparations based on the contention that Tulsa was an intermediate-point (both origin and destination) between Bradford, Pa. and Oskaloosa, Iowa. The distance from Bradford to Oskaloosa over the short tariff route (via Chicago) approximates 900 miles; while the route constructed to put Tulsa as an intermediate-point between Bradford and Oskaloosa is 2300 miles, being 155%

circuitous. "Within defendants' knowledge, there has never been a movement from Bradford to Oskaloosa by way of Tulsa." (p. 464)

In the Hermann-Brownlow case, the shipments were of lubricating products from Bradford, Pa., to Springfield, Mo. The actual movement was over specified routes to East St. Louis, thence westerly to Pleasant Hill, Mo. (southeast of Kansas City by 34 miles), thence southeasterly to Springfield, Mo. The shipper was awarded reparations on the basis that Springfield was intermediate between Bradford and points in northeastern Iowa (such as Mason City). The short tariff route from Bradford to Mason city, which operates through Chicago, is 960 miles. The Commission Report mentions three routes beyond East St. Louis in which Springfield is regarded as intermediate to Mason City. In approximate mileage and

1950. In each of those Reports, a majority of the Commission consistently adheres to the pattern that an unqualified "all route" tariff provision means every possible route which can be conceived provided only there be continuous physical connection. The real value of these two cases is in revealing the unreality and absurdity of the construction thus placed upon the "routing" and "intermediate-point" tariff provisions. They bring into full play the rules of construction cited in footnote 7 above.

The view of the Commission seems based upon the conception that the routing provision should be given the unlimited meaning under its interpretation for two reasons: (1) because the carrier can specifically provide that the tariff applies only via the routes shown therein; and (2) that the routing over which the tariff rates apply must be so stated as to be definitely ascertainable by the shipper. Each of these propositions is worth examination.

 (1) The routing provision does give the carrier the right to specify therein the routes either by express designation or by stated exceptions to an "all routes" situation. The railways of

the country form an intricate system of lines with innumerable physical connections so that it is possible to form almost countless combinations of lines (or segments thereof) into routes over which a car might be continuously carried. Each of these lines has its individual problems in setting up rate structures which will provide operating revenue and yet fit into all sorts of economic, competitive, physical and various other practical conditions. The rate structure of a line must also be synchronized into the rate structures of all of the railway systems with which it physically connects. The complexities of this broad situation are almost beyond enumeration.

There are practical difficulties to be encountered when an intermediate-point rate and routing situations are involved. Few things can be more practical and, therefore, more factual than railway rates. The fantastic and utterly unreal situations which are worked out by traffic experts for shippers can hardly be more clearly revealed than placing a railway map upon the factual situation shown in this case and in the Pure Oil and Hermann-Brownlow cases.[13]

in degrees of circuity they are as follows: Route (1) 1849 miles, 92%; Route (2) 1575 miles, 64%; and Route (3) 1783 miles, 85%.

In each of these two cases, there was, relative to the entire constructed intermediate route, a large back directional haul necessary. In the Hermann-Brownlow case, there was also "an out-of-line haul over an elongated loop embracing * * * a total distance of 336 miles" (p. 176).

13. In Pure Oil (p. 463) is stated:
"In order to establish Huntington as an intermediate origin to Bradford, and Tulsa as an intermediate destination to Oskaloosa, the complainant uses a route over the lines of The Baltimore and Ohio Railroad Company from Bradford to Huntington, the Chesapeake and Ohio Railway Company to Lexington, Ky., the Southern Railway Company to Memphis, the Missouri Pacific Railroad Company (Guy A. Thompson, trustee) to Fort Smith, Ark., the Midland Valley Railroad Company through Tulsa to Wichita.

Kans., and finally the Chicago, Rock Island and Pacific Railroad Company to Oskaloosa. The distance from Bradford to the Iowa destination over the short tariff route by way of Chicago, Ill., approximates 900 miles. The foregoing route by way of Tulsa is 2,300 miles long, or 155 percent circuitous."

In Hermann-Brownlow (p. 174) is stated:
"In reaching the conclusion that Springfield is intermediate to the stations in Iowa within the meaning of the tariff, the report mentions three routes beyond East St. Louis as follows: (1) Missouri Pacific southwesterly to Diaz, Ark., thence northwesterly to Springfield, thence St. Louis-San Francisco Railway to Kansas City, and connections beyond; (2) St. Louis-San Francisco through Springfield to Kansas City and connections beyond; and (3) actual route of movement to Springfield, thence St. Louis-San Francisco and connections beyond.

"The distance over the short tariff route from Bradford to Mason City, which operates by way of Chicago, is 960

By Rules of the Commission governing publication of freight tariffs (Rule 4(k) Circular No. 20 and Rule 27 in Supp. 5 thereto), the routing provisions involved here are *required* to be published as part of rate tariffs applicable to intermediate-point rates. When the expert ingenuity in creating imaginary routes (as revealed in this case and in footnote 13) and the complexity of our vast railway systems and the nature of rate structures are considered, the extreme difficulty of any carrier complying with these Rules, as construed by the Commission, without danger to itself is clear—it would mean anticipation and specific exception as to every imaginable so-called "route". A definite ever present peril is that it could never know, until too late, if it had underestimated the superior skill of the shipper's expert in devising a route no one else had dreamed

miles. Over the corresponding shortest routes of record embracing the routes of movement to East St. Louis and the three routes previously mentioned, the approximate distances and degrees of circuity are: Route (1) 1,849 miles, 92 percent; route (2) 1,575 miles, 64 percent; and route (3) 1,783 miles, 85 percent. Similar comparisons to Cedar Rapids result in somewhat greater degrees of circuity than those just stated.

"Assuming that the joint rates to the stations in Iowa were applicable over routes (1) and (2) above, it does not follow, as seems to be implied in the report, that those rates were applicable under the intermediate rule on these shipments which moved to Springfield over an entirely different route beyond East St. Louis. On the contrary, it is fundamental, I think, that, in the absence of tariff provisions which provide otherwise, the intermediate rule applies only when the route of movement to the intermediate station is embraced in the tariff route relied upon to the more distant station, or, stated differently, when the route over which the rates applies to the more distant station is a continuation of the route of movement to the intermediate station.

"Beyond East St. Louis, these shipments did not move to Springfield over either the line of the Missouri Pacific extending southwesterly through Arkansas mentioned in (1) above, nor over the line of the St. Louis-San Francisco mentioned in (2) above. Consequently, so far as routes (1) and (2) are concerned, the transportation of these shipments to Springfield did not constitute an intermediate movement within the meaning of the intermediate rule relied upon.

"This is particularly true of route (2) embracing the St. Louis-San Francisco beyond East St. Louis. That railroad did not participate in the movement of these shipments to Springfield. To say that the joint rates to the Iowa stations which applied over route (2) were applicable on these shipments which moved over another route to Springfield, on the theory that Springfield is an intermediate station within the meaning of the intermediate rule, gives to that rule a meaning which was never intended and for which there is not the slightest basis in my opinion. In fact, no such interpretation has ever been urged or even suggested in any other proceeding with which I am familiar.
* * *

"There remains for consideration this question: Did the joint rates from Bradford to the stations in Iowa apply over route (3) embracing the route of movement to Springfield, with the result that such joint rates were applicable on these shipments under the intermediate rule?

"Beyond East St. Louis, this route embraces the Missouri Pacific extending westerly through Jefferson City to Pleasant Hill, thence southeasterly through Harrisonville to Springfield; and thence the St. Louis-San Francisco, northwesterly, back through Harrisonville to Kansas City, and connections beyond. As stated previously, this is the shortest route of record embracing the route of movement to Springfield and the St. Louis-San Francisco and connection beyond. Considering through routes from Bradford to Mason City, this route is about 85 percent circuitous.

"But in addition to the element of circuity, it is significant that the use of this route on traffic to the stations in Iowa necessitates an out-of-line haul over an elongated loop embracing the line of the Missouri Pacific from Harrisonville to Springfield and a reverse haul over the line of the St. Louis-San Francisco from Springfield back to Harrisonville, a total distance of 336 miles."

The foregoing quotation in this footnote from the Hermann-Brownlow case is in the dissenting opinion of Commissioner Splawn (joined by Commissioners Lee, Patterson and Mitchell). It contains a much more complete statement of the factual situation than contained in the majority opinion.

of. Obviously, this would defeat the entire purpose and usefulness of the intermediate-point rate provisions in tariffs —to lessen the intricacy and bulk of rate tariffs.

 (2) That any rate should be as clearly stated as may be for the information of the shipper is true. Also, it is true that ambiguities may be taken advantage of by him. However, these rules of construction leave untouched the other rules of construction that all pertinent parts of a tariff must be construed together and that no unreasonable or unjust meaning will be accepted—particularly where such produces absurd and obviously unintended or non-understood results. A tariff is no different from any other contract, in that its true application must sometimes be determined by the factual situation upon which it is sought to be impressed.

### Conclusion

 Our conclusions are as follows:

(1) Where (as here) the facts are not in dispute and the pertinent terms in a tariff are used in their ordinary meaning, the Courts have power to construe the tariff;

(2) that general doctrines of construction of contracts are applicable;

(3) that the "routing" and the "intermediate-point" rate provisions of the' Jones Tariff must be so construed as to effectuate the purposes of both;

(4) that a "route" for "intermediate-point" rate purposes is subject to the limitation that it must not be unreasonable;

(5) that "unreasonableness" depends in this case upon (a) the extent and direction of circuity and (b) the commercial usage of a "route";

(6) that the undisputed facts in this case convince that a route from Bradford through Kansas City as an intermediate-point to these Iowa stations is unreasonable and, therefore, is not a "route" within the meaning of the Jones Tariff

governing "routes" and "intermediate-point" rates.

Such being our conclusions, the result is that the judgment of the District Court is

Affirmed.