**SAMUEL P. MANDELL COMPANY**

v.

**PENNSYLVANIA RAILROAD COMPANY and Baltimore & Ohio Railroad Company.**

**Civ. A. No. 23771.**

United States District Court, E. D. Pennsylvania.

Dec. 6, 1971.

Ned Stein, Philadelphia, Pa., for plaintiff.

Arthur E. Newbold (Dechert, Price & Rhoads), Philadelphia, Pa., Eugene Garfinkle, San Francisco, Cal., Jeremiah C. Waterman, Washington, D. C., for defendants.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. *Preliminary Statement*

In this suit under § 16(2) of the Interstate Commerce Act, 49 U.S.C. § 1 et seq. (Act), Plaintiff, Samuel Mandell Co. (Mandell), a shipper of produce, seeks to compel the payment of a reparations award by the Interstate Commerce Commission (ICC) against defendant rail carriers (Carriers) arising out of an alleged overcharge. Trial was had before the Court on a written stipulation of facts. The case involves the interpretation of certain railroad tariffs affecting goods shipped from central California to Philadelphia, and, in particular, the application of the so-called "intermediate point rule". This Opinion constitutes our findings of fact and conclusions of law under Fed.R.Civ.P. 52(a).

Plaintiff is a Pennsylvania corporation engaged in the wholesale distribution of fresh fruits, melons and vegetables throughout the eastern half of the United States. Defendants are carriers by rail in interstate commerce, subject to the provisions of the Act, and each of the defendants was a delivering carrier of one or more of the shipments in question.[1] The shipments involved carloads of fruits and vegetables moving from points of origin in central California (Salinas, Tipton, Watsonville Junction, Brentwood and Firebaugh), to Philadelphia on the Southern Pacific Railroad via the Ogden, Utah Gateway during the period May 2, 1949 to August 30, 1949. An exegesis of the history of the case (and of how its disposition has been so long delayed) is as follows.

On August 29, 1951, Mandell filed a complaint with the ICC claiming that the carriers, named and otherwise, had assessed and collected rates in excess of those published, on shipments originating in central California consigned to the eastern United States. Since around 1940 there have been two principal origin rate groups in California for certain perishable shipments to transcontinental destinations. One group covers California generally, but particularly the important growing areas in the broad cen-

---

[1]. Although not named as a defendant, the Southern Pacific Railroad has assumed the defense of the suit since the beginning of the proceedings before the Commission.

tral valley of California and the small valleys of the coast ranges. The other rate group covers the Imperial Valley region, situate in the extreme southeast corner of California and centered around the city of El Centro.

Mandell contended that the rate applicable to the shipments in question was that published from El Centro to Philadelphia in Item 1399H of § 3 of Agent L. E. Kipp's[2] Tariff, ICC No. 1508 (Kipp's Tariff). This rate, which was sought to be made applicable via the intermediate point rule, was ten cents per hundred pounds less than the rate claimed as the proper charge by the Carriers for central California points.[3] The intermediate point rule provides essentially that the commodity rates established by it apply to "any destination point . . . via a given route" where the intermediate point is "not named in the tariff, which point is intermediate to a point to which a commodity rate . . . is published . . . via a route through the intermediate point, and via such route . . . to the next point beyond."[4]

Mandell claims that the intermediate point rule makes the El Centro rate applicable because: (1) Salinas, Watsonville Junction, Tipton, Brentwood and Firebaugh, even though not named in § 3 of the tariff, are intermediate points between El Centro and Philadelphia; and (2) El Centro is the "next point be-

yond". Mandell contends for the El Centro rate, notwithstanding the fact, upon which all parties agree, that no shipments of any goods have ever traveled over a route from El Centro to Philadelphia via Salinas, Watsonville Junction, Tipton, Brentwood or Firebaugh (hereinafter the "El Centro route"). The El Centro route is therefore one hypothetically constructed for tariff purposes by use of the intermediate point rule.

The carriers claim that the applicable tariff is that published from the named central California points from which the goods were actually shipped to Philadelphia via the Ogden Gateway in Item 1147 D of § 1 of Kipp's Tariff. They assessed and collected freight charges accordingly. The Carriers argue that the hypothetically constructed El Centro route is not only inapplicable, but that it is also arbitrary, unreasonable and contrary to law.

It is appropriate at this juncture to describe the hypothetical El Centro route. The parties agree that such "route" between El Centro and Philadelphia, utilizes the lines of the San Diego and Arizona Eastern Railway Co. (San Diego Railway) to San Diego, the Atchison, Topeka and Santa Fe Railway Co. (Santa Fe Railway) to Los Angeles, and the Southern Pacific Railroad (Southern Pacific Railroad) through Salinas to Ogden, and thence to connections to the East. They also agree that

2. Kipp was a tariff publishing agent duly empowered by the various carriers, including all of the defendants, to draft and publish tariffs, and the tariff No. 1508 was published through him in that capacity.

3. The lower rate was claimed applicable by reason of the provision for *alternate application* of § 1 and § 3 of Kipp's Tariff and by virtue of the application of the intermediate point and routing rules published in Item 1275 and Item 2000E of the tariff.

4. The precise terms of the intermediate point rule contained in Item 1275 are as follows:
   "Subject to the provisions of notes 1, 2, 3, and 4 and the provisions of ex-

ception 1 below, from any point of origin from which a commodity rate on a given article to a given destination and via a given route is not named in this section, which point is intermediate to a point from which a commodity rate on said article is published in this section via a route through the intermediate point over which such commodity rate applies to the same destination apply from such intermediate point to such destination and via such route the commodity rate in this section on said article from the next point beyond from which a commodity rate is published in this section on that article to the same destination via the same route."
This rule was governed by Rule 27 of Supp. 5 to ICC Tariff Circular No. 20.

the El Centro route differed from the route to which the Carriers claim the rates in § 3 apply, i. e., from El Centro to Philadelphia using the Southern Pacific Railroad and connections to the east via Arizona and New Mexico,[5] in the following particulars:

1. The El Centro route takes traffic in a directional back haul from El Centro through Mexico to San Diego, a distance of 147 miles, thence 732 miles in a northwesterly direction to Roseville, California via the San Joaquin Valley (or 834 miles in a northwesterly direction to Roseville, California, via the coast) before turning and starting towards eastern destinations;

2. The route crosses three mountain ranges with over 2 per cent grade before returning to a point comparable to El Centro;

3. The route utilizes a railroad over which regular through perishable schedules to the east have not been maintained from El Centro;

4. The San Diego Railway did not have industries at El Centro;

5. Traffic moving to the east via the actual Southern Pacific Railroad route via Arizona and New Mexico would require no interchanges until it reached Deming, New Mexico, El Paso, Texas, or Tucumcari, New Mexico, on the Southern Pacific Railroad, whereas traffic loaded at Southern Pacific Railroad perishable sheds at El Centro and routed through central California via the San Diego Railway and the other connections outlined on the El Centro route would require three interchanges between carriers before it was turned over to a connecting line at Ogden;

6. The scheduled time to move a car from El Centro to eastern points via the El Centro route exceeded the guaranteed scheduled time using the Southern Pacific Railroad route via Arizona and New Mexico by five days, and for perishable traffic expedited service is essential.

Notwithstanding these facts, the ICC found in plaintiff's favor and awarded reparations.[6] It found that the rate to Philadelphia, Pa. from the origin points of the shipments in question, i. e., central California, was the lower rate from El Centro since the central California origin points were, in its view, points intermediate from El Centro, California to Philadelphia under the routing and intermediate point rules published in Kipp's Tariff. The ICC entered a final order on December 19, 1956 in the sum of $1,314.69 with interest at 4% from the Pennsylvania Railroad, and $24.33 with interest at 4% from the Baltimore & Ohio. The Carriers refused to pay the reparation award, and in accordance with the statutory procedure, 49 U.S.C. § 16, the plaintiff has brought this action to enforce the award.[7]

5. Since it is the validity of the intermediate point rule application from El Centro which is at issue, this is the route against which the El Centro route must be compared.

6. Mandell filed its complaint before the Interstate Commerce Commission against the Pennsylvania Railroad Company, the Baltimore & Ohio Railroad Company and other carriers on June 24, 1952. The Commission rendered its decision against the carriers on September 3, 1952. Thereafter, petitions for reconsideration were filed with the Commission and on July 8, 1953, the Commission affirmed its prior findings. A further petition for reconsideration was filed with the Commission. A proposed report by the examiner was filed, to which the carriers excepted and on June 18, 1956, the Commission affirmed its prior findings. On September 19, 1956, the Commission entered its order in the matter setting forth the amounts that the carriers were liable for. The carriers then filed another petition for reconsideration and the Commission vacated the September 1956 order. On November 19, 1956, the Commission denied the petition for reconsideration. On December 19, 1956, the Commission entered a final order, specifically awarding Mandell reparations in the amounts set forth in its opinion.

7. 49 U.S.C. § 16(2) provides, *inter alia*: "If a carrier does not comply with an order for the payment of money within the time limit in such order, the complainant, or any person for whose

Although the ICC award was entered on December 15, 1956, suit was not instituted in this Court until December 16, 1957. The matter came onto the Court's master calendar, and preliminary motions were heard by a number of judges sitting on the motion list. After disposition of the motions, the matter became dormant; the parties did not press it or order it down for trial. Ultimately, the matter came onto the individual calendar of the undersigned, who summoned the parties and heard the case on a stipulation of facts and briefs.

Finding the hypothetically constructed El Centro route to be arbitrary, unreasonable and contrary to law, we refuse to enforce the Commission's order.[8] Resolution of the question before us will require a rather lengthy reconstruction of the tariff provisions, including an examination of the few cases which have construed similar tariff provisions, especially the pivotal decision of the Eighth Circuit in A. E. West Petroleum Co. v. Atchison, T. & S. F. Ry., 212 F.2d 812 (1954) which we elect to follow.

Because Mandell asserts that the Court is without power to set aside a Commission order, we must first address our attention to the question of the scope of the Court's review of Commission orders.

## II. *Scope of Review*

■ ■ It is well settled that tariff construction is a question of law. The Court is being asked here to construe the language contained in a written document. No administrative determination was made as to any matters of fact, and no resort was had to any field of technical knowledge wherein the Commission might be deemed to have special competence. A tariff, for our purpose here is not essentially different from any other written instrument. This has long

been the settled rule of the law. See Gt. No. Ry. Co. v. Merchants' Elev. Co., 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943 (1922); Lafond Motor Co. v. No. Pac. Ry. Co., 2 F.Supp. 658 (D.C.Minn.1932); W. P. Brown & Sons Lumber Co. v. L. & N. R. Co., 299 U.S. 393, 57 S.Ct. 265, 81 L.Ed. 301 (1937); A. E. West Petroleum Co. v. Atchison, T. & S. F. Ry., 212 F.2d 812 (8th Cir. 1954). Furthermore, it is settled law that a tariff must be construed to avoid unjust, absurd, or improbable results. National Van Lines, Inc. v. United States, 355 F.2d 326 (7th Cir. 1966); A. E. West Petroleum Co. v. Atchison, T. & S. F. Ry. Co., *supra.* The test of interpretation of railroad tariffs was well set out in United States v. Missouri–Kansas–Texas R. R. Co., 194 F.2d 777, 778–779 (5th Cir. 1952):

"The construction of a printed railroad tariff presents a question of law and does not differ in character from that presented when the construction of any other document is in dispute. The four corners of the instrument must be visualized and all the pertinent provisions considered together, giving effect so far as possible to every word, clause, and sentence therein contained. The construction should be that meaning which the words used might reasonably carry to the shippers to whom they are addressed, and any ambiguity or reasonable doubt as to their meaning must be resolved against the carriers. But claimed ambiguities or doubts as to the meaning of a rate tariff must have a substantial basis in the light of the ordinary meaning of the words used and not a mere arguable basis."

■ It is our task then to review the Commission's decision, and if we find its interpretation contrary to law, to set it aside.

benefit such order was made, may file in the district court of the United States . . . a complaint setting forth briefly the causes for which he claims damages, and the order of the commission in the premises."

8. As will be seen below, we also disagree with the Commission's interpretation of the intermediate point rule and of the tariff itself.

### III. *The Rationale of the ICC Order*

As we have pointed out, the Commission interpreted the tariff to "permit" the application of the lower rate as published in Item 1399H contained in § 3 of Kipp's Tariff by means of the alternative provision [9] and in conjunction with application of the intermediate point origin rule contained in § 3. The Commission [10] concluded in its final opinion, Samuel P. Mandell Co. v. Pennsylvania R. R., 298 I.C.C. 609 (1956):

> "Here, the defendants parties to the Kipp Tariff prior to September 1, 1949, elected to provide for and published routing which plainly stated that, except as otherwise provided in the tariff (and no other routing was provided from El Centro on the San Diego-Arizona Eastern), all rates subject to the intermediate rule would apply over any and all routes made by the use of the lines of any of the carriers parties to the tariff . . . . The publication by the defendants of this plan of routing rendered the application of the claimed routes both definite and certain, and presumably reasonable." *Id.* at 615.

The rates established in § 3 were subject to routing instructions contained in Item 2000E of Kipp's Tariff. Those instructions provided that:

> "Except as otherwise specifically provided in this tariff, the rates authorized in this tariff apply only as follows:
>
> (1) West of Western Gateways shown in 'South Coast Territorial Directory' via the Western Gateways indicated therein opposite each point.
>
> (2) From Gateways named on page 52 of C.F.A.T.B. Freight Tariff No. 560–B, Agent B. T. Jones I.C.C. No. 3958, on traffic destined points in Indiana, Kentucky, Michigan, New York, Ohio, Pennsylvania and West Virginia located in Groups B (points named in Item 110 only), C and C–1 (See Item 30) via routes provided therein. The provisions of this paragraph are not to be construed as indicating gateways via which the through joint rates published in this tariff apply.
>
> (3) Via all routes made by the use of the lines of any of the carriers parties to this tariff, except as otherwise, provided in 'South Coast Territorial Directory.' The provisions of this paragraph are not to be construed as taking precedence over routing provided in paragraphs (1) and (2)."

In approving the construction of the El Centro route, the Commission found subparagraph 1 of Item 2000E not to be applicable because in the publication of the South Coast Territorial Directory (Directory), El Centro was not listed as a stop on the San Diego Railway. The Commission found the applicable provision to be subparagraph 3 instead, which provided that in the absence of other routing in the Directory, the rates named would apply over *all routes* [11] made by the use of the lines of any of the carriers parties to the tariff. For tariff purpos-

---

9. The alternative provision also stated that:
> "If the charge accruing under section 1 of this tariff is lower than the charge accruing under this section on the same shipment via the same route, the charge accruing under section 1 will apply."

Since the rates in § 3 were lower than those in § 1, the § 3 rate applied.

10. In accord with the statutory procedure contained in § 16(2), Mandell placed before the Court the Commission's opinions reported as:
Samuel P. Mandell v. Pennsylvania R. R., 286 I.C.C. 665 (1952); Samuel P. Mandell v. Pennsylvania R. R., 289 I.C.C. 244 (1953); Samuel P. Mandell v. Pennsylvania R. R., 298 I.C.C. 609 (1956).

In pertinent part, 49 U.S.C. § 16(2) provides:
> "Such suit in the district court of the United States shall proceed in all respects like other civil suits for damages, except that on the trial of such suit the findings and order of the commission shall be prima facie evidence of the facts therein stated. . . . "

11. In this opinion, the word "line" represents the trackage controlled in whole

es, according to the Commission, this constituted definite or specific routing in that the carriers parties to the tariff took affirmative steps to specifically provide for routing through intermediate origins. Because Item 1399H did not designate any railroad serving El Centro from which the named rates applied, the Commission found that it must be construed as unrestricted insofar as any railroad party to the tariff and serving El Centro was concerned. To determine what lines served El Centro, the Commission then looked to Agent A. P. Leland's Official List of Open and Prepay Stations,[12] referred to in both Kipp's Tariff and the Directory, and found that it was listed as a stop served by the lines of the Holton Inter Urban Railway Co., the San Diego Railway and the Southern Pacific Railroad.

Finding El Centro served by the San Diego Railway, the Commission applied the intermediate point rule to make the central California points intermediate between El Centro and Philadelphia. The Commission justified this finding by concluding that:

> "The words 'via a given route' and 'via such route' as used in the intermediate rule in section 3 of the tariff established the El Centro rates from unnamed points intermediate to El Centro over the same route of the San Diego & Arizona Eastern, the Santa Fe, and the Southern Pacific through the Ogden gateway, just as definitely as if the rates had been specifically named from those intermediate points in section 3 of the tariff." 298 I.C.C. at 613.

Prior Commission decisions had established that where the tariff specifically provided for definite routing, as here, even though unrestricted as to choice of lines, the Carriers parties to the tariff could not be heard to complain about unreasonableness or circuity and other considerations extraneous to the tariff, since the Carriers could have, by agreement, designated the use of specific lines from any given point. Having failed to designate any such lines, the Carriers were found to be bound by their tariff, including the route constructed by Mandell.

## IV. *The Ground of Our Decision*

■ ■ We reject the ICC interpretation of the tariff because, in our view, the law imposes the limitation that a route for "intermediate point" rate purposes must not be unreasonable. We find the route sanctioned by the Commission to be unreasonable in the manner that it constructs routes by piecing lines together without any semblance of relation to actual use or commercial reality. In addition to this finding, we have also concluded that the Commission erred in its application of the intermediate point rule to the case and in its interpretation of the tariff. Any of these three grounds would support our decision. We discuss the three grounds in what is essentially inverse order.

### A. *Arbitrariness*

The leading case, upon which we rely, is A. E. West Petroleum Co. v. Atchison, T. & S. F. Ry. Co., *supra*, where the Court of Appeals for the Eighth Circuit reviewed tariff provisions similar to those in issue here. The plaintiff, a dealer in petroleum products in Kansas City, Missouri, had shipped to it a number of carloads of oil from Bradford, Pa. The freight rate charged was published from Bradford to Kansas City. Plaintiff claimed a lower rate on the basis of the intermediate point rule, contending that shipments could move from Bradford to Iowa stations, such as Cedar Rapids and Moravia, through Kansas City, making

---

or in part by a railroad, such as the lines of the Southern Pacific, whereas a "route" means the connecting trackage of whatever "lines" over which shipments may travel. See A. E. West v. Atchison, T. & S. F. Ry., *supra*.

12. Agent A. P. Leland's list was contained in Item 95 of Kipp's Tariff, which provided: "This tariff is governed by Official List of Open and Prepay Stations No. 59, I.C.C. NO. A–24, C.T.C. No. A–24, (A. P. Leland, Agent) . . . .".

Kansas City an intermediate point. The court found that such a route:

". . . required a directional back haul from Kansas City toward Chicago, in excess of the direct route from Chicago, of 528 miles for Cedar Rapids and of 317 miles for Moravia—this excess mileage (from origin to the Iowa point) being, percentagewise, almost 62% as to Cedar Rapids and almost 35% as to Moravia." *Id.* 212 F.2d at 816.

Furthermore, the court found that "no normal, customary, cognizable volume of shipments ever moved from Bradford to those destinations via Kansas City." These facts fashioned the court's determination that the Commission's interpretation of the intermediate point rule was contrary to the "geographical and the commercially practical purposes" of the rule, leading to "absurd results not within the reasonable understanding of the shipper nor the intent of the carrier." *Id.* at 818. *Inter alia,* the court concluded that a "route" for "intermediate point" rate purposes was subject to the limitation that it must not be unreasonable, and that unreasonableness depended on: (1) the extent and direction of circuity; and (2) the commercial usage of a "route". The Court refused to enforce the reparations award and affirmed the dismissal of the complaint by the district court.

Our research has revealed two recent apposite cases which are the progeny of *West.* In each, the courts refused to enforce ICC reparations awards.

In Blandin Paper Co. v. Great Northern Railway Co., 265 F.Supp. 761 (D. Minn.1967), the plaintiff claimed the lower Chicago rate on shipments of paper from Grand Rapids, Minnesota to Des Moines, Iowa, contending that Des Moines was intermediate to Chicago from Grand Rapids, on three possible routes. These routes involved a circuity range of 45%, 37% and 51% respectively, though only one of the routes involved a directional back haul. As in *West,* the court found that "no normal, customary, cognizable volume of shipments has ever moved from Grand Rapids to Chicago via any of these three routes." *Id.* at 762. Alluding to the determination of the hearing examiner that *West* only proscribed routes which involved a directional back haul, the court held that the controlling factor was "unreasonable circuity", with directional back haul being merely one variety of circuity. It held that all three routes were unreasonable on the basis of the circuity, and struck them down.

The other case decided upon the criteria laid down in *West* is Hygrade Food Prod. Corp. v. New York Central R. Co., 266 F.Supp. 946 (N.D.Ill.1967). In that case the plaintiff claimed that the rates on products shipped from Indianapolis, Indiana, to various destination points in the southeast, *i. e.,* Morehead City, North Carolina; Charleston and Columbia, South Carolina; Albany and Thomasville, Georgia; and Jacksonville and Hialeah, Florida, were inapplicable and unreasonable. By application of the intermediate point rule, the Commission had found Indianapolis to be an intermediate point from Evansville in the southwesterly corner of the state via Indianapolis in the state's center to Cincinnati on the New York Central, and thence to destinations via the lines of other defendants. Factually the court found that there was no commercial usage of any kind on the constructed route; that the average circuity of the constructed route ranged from 35% to 47% depending on whose figures were used; and that a shorter, though still circuitous route, existed from Evansville through Washington, Indiana, to Cincinnati and destinations. In rejecting the Commission's decision, the court held, *inter alia,* that the *extent* of circuity was not determinative of the issue of reasonableness since *West* established that for application of an intermediate route rule the route constructed must be reasonable "in light of three equally important factors: (1) the extent and (2) the direc-

tion of circuity and (3) the commercial usage of a route." The court concluded:

> "Underlying the Commission's decision is the premise that since the constructed route physically exists, and since nothing in the tariff specifically prevents application of the intermediate route over the constructed route, the route is authorized and the rule must apply. Mere physical connections are not enough to establish a route. Here the record shows beyond question that as a matter of practice the carriers have never and do not now hold themselves out to provide service over the constructed route, and indeed, that no shipper has ever requested service to the southeastern destinations over the constructed route. Thus both the carriers' and the shippers' course of business negatives the existence of the constructed route." *Id.* at 951–952 (citations omitted).

■ The cases we have reviewed involved a range of circuity of at least 35%. They do not, however, establish the 35% figure as an arbitrary determinant of circuity. Rather, the cases establish: (1) that a three-pronged test of unreasonableness based on the *extent* and *direction* of circuity and the *commercial* usage of the route, *West, supra,* (2) that directional back haul is not a prerequisite to a finding of unreasonableness, but is merely a variety of circuity, *Blandin, supra*; and (3) that degree of circuity is not determinative of unreasonableness, *Hygrade Food Products, supra.*

On the basis of these principles and on the stipulated facts of the case at bar, we make the following determinative findings.

From El Centro, the route the shippers sought to construct through central California via the Ogden Gateway to Philadelphia was approximately 3,816 miles long. Since it is the validity of the intermediate point rule application from El Centro which is at issue, the route against which this mileage must be compared is the short route directly east from El Centro through Arizona and New Mexico. The short route, however, covers a distance of only 2,928 miles. The divergence or circuity amounts to 30.3%. One of the ingredients in the circuity is a directional back haul, through Mexico, of 147 miles. Moreover, there has never been any movement of goods over the El Centro route. Such a route is not commercially feasible for the shipment of perishable goods, for which expedited service is essential, because: (1) the route crosses three mountain ranges with over two per cent grade before returning to a point comparable to El Centro; and (2) the time required to make the trip from El Centro to the central California points would take about the same length of time as it would to travel from central California to the eastern destinations, the overall time required for the El Centro route exceeding the short route by five days!

There is no evidence that the carriers ever held themselves out to provide services over the constructed route, nor that the shippers ever sought such service. As in *Hygrade Food Products,* "both the carriers' and the shippers' course of business negatives the existence of the constructed route." In light of these facts we find the *West* line of cases controlling and in so doing specifically reject the Commission's finding that the route constructed was not unreasonable and contrary to law.

B. *Incorrectness of the Commission's Interpretation of the Intermediate Point Rule*

■ Although we have found the Commission's interpretation of the tariff to be arbitrary, we also find that the Commission should not, under the applicable law, have adopted the strained interpretation of the intermediate point rule contained in Item 1275 of Kipp's Tariff that it did in the case. As we have seen, the application of this rule was limited to routes over which the rates in § 3 applied. The Commission's theory of the rule is clearly set out in its decisions. *See, e. g.,* Pure Oil Co. v. Alton & S. R.,

284 I.C.C. 461 (1952); Hermann-Brownlow Co. v. Missouri Pac. R. R., 278 I.C.C. 171 (1950); T. M. Tull Metal & Supply Co. v. Baltimore & O. R., 301 I.C.C. 83 (1957). Those principles, in general, are: (1) where routes are considered *open,* that is, unrestricted as to choice of lines, shippers are free to construct only such routes as are reasonable and logical; (2) however, where "specific routing" is provided by the tariff, and presumably by agreement of the parties thereto, any route may be constructed from the lines of the parties to the tariff without regard to their reasonableness.

■ In our discussion of the intermediate point rule we are concerned only with the second principle enunciated above, for it is this principle which underlay the Commission's decision in Mandell. Because the tariff was constructed to provide for "specific routing," the Commission held that the shippers were free to tack together *any lines* of the carriers parties to the tariff. We find, however, that its interpretation of the intermediate point rule clearly contravenes prevailing decisional law. *See West, Blandin, Hygrade Food Products, supra.* Our review of the apposite cases confirms our holding that the choice of lines shippers have in constructing a route is limited by a rule of reasonableness, whether such routing is designated as *open* or *specific.*

In Thompson v. United States, 343 U.S. 549, 72 S.Ct. 978, 96 L.Ed. 1134 (1952), the Supreme Court considered and rejected the theory that through routes exist between all points throughout the country wherever physical rail connections are available. *Thompson* was not concerned with the interpretation and application of an intermediate point rule, but rather with the power of the Commission to establish "through routes" pursuant to § 15(3) of the Act. Nonetheless, we find the Court's holding that mere physical connection among various lines is not sufficient to establish a commercial route for transportation purposes instructive on the question before us be-cause it negatives that part of Mandell's and the Commission's argument that Mandell was free to use *any* of the lines of the parties to the tariff to construct its route. Justice Vinson succinctly stated:

"In short, the test of the existence of a 'through route' is whether the participating carriers hold themselves out as offering through transportation service. Through carriage implies the existence of a through route whatever the form of the rates charged for the through service." *Id.* at 557, 72 S.Ct. at 983.

The record before us establishes that there never was any through carriage on the route constructed, and we hold that the Commission should not have applied the intermediate point rule as it did in the case.

### C. *Misinterpretation of the Tariff*

■ The third ground of our opinion is that the Commission erred in its interpretation of the tariff. Based on the test for tariff interpretation laid down in United States v. Missouri-Kansas-Texas R. R., *supra,* and construing the provisions to give reasonable effect to their meaning, our interpretation of the relevant terms is as follows. Subparagraph [1] of Item 2000E of Kipp's Tariff provided that the published rates in § 3 of Item 1399H apply only via the Western gateways indicated opposite each point in the Directory, i. e., directly eastbound through Arizona Gateways:

"Except as otherwise specifically provided in this tariff, the rates authorized in this tariff apply only as follows:

(1) West of Western Gateways shown in 'South Coast Territorial Directory' via the Western Gateways indicated therein opposite each point. . . ."

Furthermore, Item 85(a) of the Directory stated that:

"rates provided in 1399H apply *only* from the point designated in the Ter-

ritorial Directory and *only* via the Western Gateway indicated *opposite* each point." (emphasis supplied).

El Centro was not named in the Directory as a point on the San Diego Railway from which the rates in Kipp's Tariff applied; rather it was listed as being served by the Southern Pacific and only when routed directly east *via the Southern Pacific in connections with the Western Gateways through Arizona.* The Commission erroneously placed El Centro as a station on the San Diego Railway for purposes of 1399H by reference to Agent Leland's Official List of Open and Prepay Stations. But, Item 2000E, subparagraph (1) restricted use of the tariff *only to the points named in the Directory.* The use of Agent Leland's List, however, was specifically limited by the tariff to those purposes stated in Item 95:

". . . as to prepay requirements, changes in names of stations, additions and abandonments of stations, billing instructions from or to points not on railroads, restrictions as to non-acceptance or non-delivery of freight and changes in station facilities, except as otherwise shown in tariff."

Nowhere in the tariff does it appear that Agent Leland's List was intended to be used to determine from what stations the rates in § 3 applied. The Commission then could not rely on subparagraph (1) because, by its very terms, it precluded routing through central California since it applied only to directly eastbound traffic on the Southern Pacific through the Western Gateways in Arizona and not westward on the San Diego Railway.

Furthermore, the Commission's reliance on subparagraph (3) was misplaced because it superseded the provisions of subparagraph (1), ignoring the very language of the section:

(3) "via all routes made by the use of the lines of any of the carriers parties to this tariff, except as otherwise provided in the 'South Coast Territorial Directory.' *The provisions of this paragraph are not to be construed as taking precedence over routing provided in paragraphs (1) and (2)."* (emphasis supplied).

Our reading of Item 2000E is that it provides routing guides for rate application as published in § 3 from place of origin to place of destination and that shippers are not free to select from among its provisions to construct any route. We find that: (1) the rates of 1399H apply only via the Western Gateways shown in the Directory, as set out in subpar. 1; (2) once the Western Gateways are selected subparagraphs (2) (supra) and (3) set out routing from the Western Gateways to destination; (3) subparagraph (2) sets out routes from midwestern gateways to eastern destinations by reference to Agent B. T. Jones' I.C.C. No. 3958 and; (4) subparagraph (3) supplements the routing provisions of subparagraph (1) by providing for routing to final destination where not provided for in subparagraphs (1) and (2). It appears, then, that subparagraph (3) has no application because by its very terms it is *not* to "be construed as taking precedence over routing provided in paragraphs (1) and (2)", and subparagraph (1) applies from El Centro only on shipments moving directly east on the Southern Pacific through named gateways in Arizona. We conclude then that the lower rates of Item 1399H cannot be applicable on central California origin points over the route constructed, and that the rate which was charged by the Carriers, i. e., from the central California points from which the goods were actually shipped to Philadelphia via the Ogden Gateway in Item 1147D of § 1 of Kipp's Tariff, was the proper one.

## V. *Conclusion*

For all of the foregoing reasons, we refused to enforce the ICC's reparations award, and enter judgment in favor of the defendants. We conclude with the comforting note that Item 1399H of Kipp's Tariff, ICC No. 1508, was amended September 1, 1949 by Item 1399I, which expressly provided that the Item 1399 rate applied from El Centro *only* .

*via the Southern Pacific Railroad.* Such amendment eliminated the possibility of the situation being litigated here arising again, since it proscribed the use of the hypothetical route constructed by Mandell.